IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | NO: 3:04-CR-0240-P |
| | § | |
| MUFID ABDULQADER (7) and | § | |
| ABDULRAHMAN ODEH (8) | § | |

### MEMORANDUM OPINION AND ORDER

Now before the Court are (1) Defendant Mufid Abdulqader's Motion for Judgment of Acquittal Under Federal Rule of Criminal Procedure 29, filed October 31, 2007 (Docket No. 876) and (2) Defendant Abdulrahman Odeh's Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. Pro. 29(c), filed October 30, 2007 (Docket No. 875). After careful consideration of the evidence, the Parties' briefing, and the applicable law, the Court hereby DENIES both motions.

### BACKGROUND

On January 24, 1995, the United States government ("Government") designated the Islamic Resistance Movement (or Hamas) a Specially Designated Terrorist organization. This designation makes it illegal for anyone in the United States to engage in any unlicensed transactions with Hamas or its property or interests. On October 8, 1997, the Government designated Hamas a Foreign Terrorist Organization, which made it illegal for anyone in the United States to provide material support or resources to Hamas. Both designations remain in place today.

Hamas is a Palestinian Islamist militant organization and political party whose stated objective is to destroy the State of Israel and replace it with an Islamic state comprising what is now Israel, the West Bank and the Gaza Strip. At trial, the Government's evidence showed that Hamas

1

is organized into three separate divisions - a military wing responsible for carrying out suicide bombings and other terrorist attacks (Al-Qassam Brigades); a social wing that operates much like a social welfare agency; and a political wing that sits above the military and social wings and is responsible for setting policy regarding Hamas's activities.

There was evidence at trial to prove that Defendant Holy Land Foundation for Relief and Development ("HLF")[1] was created by the United States branch of the Muslim Brotherhood[2] as part of the Palestine Committee (or Central Committee)[3] with the stated mission of providing support to Hamas. (Exs. 3-5 & 3-17.)[4]  In furtherance of this mission, the evidence showed that the Palestine Committee established three organizations:  HLF, which raised money; the United Association for Studies and Research - UASR, which established policy; and the Islamic Association of Palestine - IAP, which disseminated information/propaganda.

According to the Government, HLF provided support to Hamas by raising money in the United States and sending it overseas to charities known as "zakat committees" in the Israeli-occupied Palestinian territories of the West Bank and Gaza.  These zakat committees provide humanitarian assistance such as food, medical care, education, and financial resources to people living in the Palestinian territories.  The Government contends that certain zakat committees were

---

[1] Formerly the Occupied Land Fund.

[2] The Government's expert witness, Matthew Levitt, testified that the Muslim Brotherhood is an international Islamic fundamentalist movement.

[3] The Palestine Committee is the body within the United States-based Muslim Brotherhood that is primarily responsible for organizing the Palestinian efforts.

[4] All cites to "Ex." reference the Government's trial exhibits at the first trial of this case.

operated by or for the benefit of Hamas. By giving money to these zakat committees, HLF was able to help Hamas in its mission.

## PROCEDURAL HISTORY

On July 26, 2004, a federal grand jury indicted Defendants Mufid Abdulqader ("Abdulqader") and Abdulrahman Odeh ("Odeh") and others in a 42-count indictment. On November 30, 2005, the grand jury returned a 42-count superseding indictment charging the defendants, including Abdulqader and Odeh, with (1) conspiracy to provide material support to a designated foreign terrorist organization [Count 1], (2) providing material support to a designated foreign organization [Counts 2-10], (3) conspiracy to provide funds, goods and services to a specially designated terrorist [Count 11], (4) providing funds goods and services to a specially designated terrorist [Counts 12-21], (5) conspiracy to commit money laundering [Count 22], and (6) money laundering [Counts 23-32].

Jury selection commenced in this case on July 16, 2007. The jury heard evidence for approximately nine weeks. The Government rested its case-in-chief on August 30, 2007. On that date, each defendant timely moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Judge A. Joe Fish, the presiding judge, ruled as follows:

> THE COURT: Thank you. Ladies and Gentlemen, my function under Rule 29 is a very limited one, and that is to decide if there is sufficient evidence in the record which if believed by a reasonable trier of facts such as this jury could support a judgment of guilt beyond a reasonable doubt. And it is my opinion that there is such evidence in the record. I am not supposed to weigh the evidence or draw inferences about the evidence but simply decide whether there is sufficient evidence for this jury to convict the defendants or any of them on the charges in the indictment, and I believe there is sufficient evidence on that score. So I must deny the motions for judgment of acquittal, but I do find that they were properly and timely made under the rule.

(Tr. Transcript, Vol. 15 at 45.)

On September 20, 2007, the jury began its deliberations. On September 26, 2007, Juror Number 6 was excused. On October 1, 2007 - the third full day of deliberations with the replacement juror for Juror Number 6 - the jury executed a verdict sheet acquitting Abdulqader of all thirty-two counts with which he was charged. (Doc. #867 at 104.) The jury set aside the verdict sheet for Abdulqader and commenced deliberations on the other defendants. *See* "Holy Land Trial Notes Reveal Jury in Turmoil," Dallas Morning News, Oct. 24, 2007. The jury also reached a unanimous verdict acquitting Odeh on Counts 2-10 and 12-32.

On October 18, 2007, the jury indicated in a note that it had reached a verdict as to all counts on one defendant and as to some counts on two other defendants. The jury stated it was deadlocked as to the remaining counts and defendants. (Doc. #870.) Magistrate Judge Paul Stickney received the verdicts in the presiding judge's absence and sealed them for four days at the Government's request, pending presiding Judge Fish's return on Monday, October 22, 2007. On October 22, 2007, Judge Fish unsealed the verdict sheets and read them into the record. Abdulqader's signed and dated verdict sheet indicated that the jury had acquitted him of all counts with which he was charged. (Doc. #867.) Judge Fish then polled the jurors individually, asking whether they agreed with the verdicts. Three jurors initially indicated they did not, but after a brief recess to permit the jury members to confer, Judge Fish re-examined the three non-consenting jurors regarding each individual defendant and only one of the three refused to affirm the verdict the jury had rendered as to Abdulqader. Two jurors disavowed the verdicts as to Odeh.

4

**LEGAL STANDARD**

A motion for judgment of acquittal "challenges the sufficiency of the evidence to convict." *United States v. Medina,* 161 F.3d 867, 872 (5th Cir. 1998) (citing Fed. R. Crim. P. 29(a)), *cert. denied,* 526 U.S. 1043 (1999). The standard for a motion for judgment of acquittal is whether, "reviewed in the light most favorable to the government, drawing all reasonable inferences in support of the verdict," "a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." *United States v. Pennington,* 20 F.3d 593, 597 (5th Cir. 1994). In other words, "[t]he only question is whether a rational jury could have found each essential element of the offense beyond a reasonable doubt." *Id.* The court does not assess the credibility of witnesses or weigh the evidence, since the jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Loe,* 262 F.3d 427, 432 (5th Cir. 2001), *cert. denied,* 534 U.S. 1134 (2002); *see also United States v. Molinar-Apodaca,* 889 F.2d 1417, 1423 (5th Cir. 1989).

**A.     Evidence Concerning Abdulqader.**

Viewing it in light most favorable to the Government, the evidence establishes that Defendant Abdulqader is the half-brother of the highest-ranking member of Hamas worldwide, Khalil Mishal. At trial, the Government introduced a 1997 transcript of a telephone call between Abdulqader and Defendant Shukri Abu Baker about Israel's attempt to assassinate Mishal. (Ex. 13-135.) The jury also heard a 1999 conversation between the two about Jordan's expulsion of Mishal. (Ex. 18-7.) Exhibit 18-9 is a transcript of a conversation about the expulsion of Mishal by Jordan and the effects therefrom on Mishal and Abdulqader's family. (Ex. 18-9.)

Government Exhibit 1-21 lists Abdulqader as a volunteer fundraiser in the United States who was available to speak on behalf of HLF to help HLF raise money. Abdulqader traveled for HLF to do volunteer fund-raising. (Exs. 1-43, 1-44.) Abdulqader was reimbursed by HLF for his expenses and given bonuses for his "exceptional contributions." (Mot. at 17.) Government Exhibit 1-340 establishes that Abdulqader raised $114,194 for HLF between August 1997 and August 2000.

Abdulqader also sang and performed in a band ("Al Sakhra") that was part of the Palestine Committee in the United States. An undated 1991 organizational chart of the Palestine Committee lists the "Sakhra Group" as a division of the IAP and lists two of its band members as members of the Palestine Committee. (Ex. 3-1.) The Al Sakhra band raised money for the HLF at IAP-run festivals. At these festivals, donations were openly solicited to support Hamas through the HLF. The Government introduced an invoice from the Al Sakhra Band to HLF in 1998 for a performance in Charlotte at which Abdulqader sang. (Ex. 1-18.) Financial records indicate that HLF paid for the band's expenses and provided bonus income to the band members, including Abdulqader.

An undated report issued by the Palestine Committee entitled "Annual Report for the year 89-1990" listed as one of its achievements of the year that the "Al Sakhra band participated in over 25 festivals during activities of the Association and the Fund." (Ex. 3-5.) The same report identifies the HLF as part of the Palestine Committee and notes that the IAP, the UASR and the HLF represent the Palestine Committee's "strong arm" which provides support for the emerging Hamas movement. (Ex. 3-5.) Government Exhibit 3-17 entitled "Meeting Agenda for the Palestine Committee 7/20/1994" again identifies the HLF with the Palestine Committee one of whose stated purposes is noted in the report to be collection of donations for Hamas.

6

At trial, the Government played numerous videotapes, many seized from the HLF and dating back to before Hamas was designated as a terrorist organization. In addition to the open solicitation of donations for Hamas through the HLF, these videos depicted performances of the Al Sakhra band, with Albdulqader singing songs of praise for Hamas and violent jihad and performing skits depicting the killing of Jews.

The Government also introduced a voided receipt with Abdulqader's signature from the Courtyard by Marriott hotel in Philadelphia, which arguably shows Abdulqader's presence during the 1993 Philadelphia Conference - two years before Hamas was designated a terrorist organization. (Ex. 21-60.) Abdulquader argues he was not at the Philadelphia Conference because the Al Sakhra band was playing elsewhere during that time frame. The evidence does clearly establish Abdulquader's presence or absence at the Philadelphia Conference. Viewing the evidence in light most favorable to the government, the jury could have believed Abdulquader was present at the Philadelphia Conference for at least part of the time. The Philadelphia Conference was significant because it was attended by several members of the Palestine Committee, which supported and collected money for Hamas. At the meeting, attendees discussed how to proceed in light of the recently negotiated Oslo Accords between Israel and Palestinians. Hamas opposed the Accords because it called for the recognition of the state of Israel. The attendees also discussed how they would have to be careful in their opposition to the Oslo Accords because they did not want to be viewed as being against the peace process or as aligned with terrorist groups. The attendees agreed not to mention the word Hamas but to refer to Hamas as "Samah" which is Hamas spelled backwards. The Philadephia meeting essentially laid out the path that the Palestine Committee would take to accomplish its goal of supporting Hamas in the future.

In his motion for acquittal, Abdulqader gives a biographical account of his education, family and career in the United States - however, much of this information was not offered into evidence at trial. The Court is required under Rule 29 to view the evidence in the light most favorable to the government, not in the light most favorable to the defendant. *See United States v. Schuchmann*, 84 F.3d 752, 753 (5th Cir. 1996). Contrary to Abdulqader's insinuation, the fact that the Government did not have more evidence against Abdulqader does not mean that a reasonable trier of fact could not have found Abdulquader guilty beyond a reasonable doubt based on the evidence that was presented.

The Court concludes that the Government's specific evidence concerning and involving Abdulqader coupled with the evidence about the histories of the Israeli-Palestinian conflict and the many organizations involved, HLF's connection with Hamas, and Abdulqader's connection to HLF is sufficient for a reasonable jury to conclude that Abdulqader was a knowing participant in a conspiracy to provide material support to Hamas (Count 1). Likewise, the Court concludes that the Government's evidence against Abdulqader was sufficient for a reasonable jury to conclude that Abdulqader was a knowing participant in a conspiracy to provide funds, goods or services to Hamas (Count 11). Likewise, the Court concludes that the evidence against Abdulqader was sufficient for a reasonable jury to conclude that Abdulqader was a knowing participant in a conspiracy to commit money laundering as alleged in the indictment (Count 22).[5]

---

[5] Prior to the second trial of the case, the government dismissed counts 2-10, 12- 21 and 23-32 against Abdulquader.

**C. Evidence Concerning Odeh.**

According to the Government, Odeh was head of the HLF's New Jersey Office from February 1994 until it was shut down in 2001. During its investigation into this case, the Government seized from the New Jersey office a 1991 UASR publication entitled "The Palestinian Intifada in the Hebrew Press - A Study About The Islamic Resistance Movement 'Hamas'." (Ex. 1-174.) That publication discussed the arrests of certain high-ranking Hamas leaders - some of whom were in charge of the zakat committees to which the HLF gave money and identified as "ours." (Ex. 1-174, 3-7.) The Government also seized from that office an IAP publication entitled "Jihadist School." (Ex. 1-16.) Also seized from the New Jersey office was an IAP flyer announcing the one-year anniversary of Sheik Yasmin's imprisonment (Hamas founder) and a photograph of Hamas leader Mishal, Hezbollah leader Hassan Nesrallah and cleric Yousef al-Qaradawi. (Exs. 1-147, 1-197.)

The Government also recorded a 1995 telephone conversation between Odeh and Defendant Mohammad El-Mezain in which Odeh reports a Hamas suicide bombing in Tel Aviv as a "beautiful operation." (Ex. 15-21.) On January 5, 1996, Odeh called Defendant El-Mezain to tell him that Yehya Ayyash, the Hamas member known as "The Engineer," had been assassinated in Gaza by Israel. (Ex. 15-5.) Ayyash was the individual credited with inventing the suicide vest worn by Hamas suicide bombers. The Government introduced evidence that after Ayyash's death, Odeh began to sponsor the youngest son of Ayyash through the HLF orphan sponsorship program. (Exs. 1-27, 1-38, 1-228.)

The New Jersey office of the HLF - headed by Odeh - raised over $62,000 in contributions in late-1996. During his employ from 1994 through 2001, Odeh raised approximately $180,000 for

9

the HLF. The New Jersey office garnered 19 orphan sponsorships in late-1996, compared to 1 for Michigan, 7 for Houston, and 9 for Chicago. (Ex. 1-59.) The Government introduced a Weekly Report from the New Jersey office from late-July 1996 that stated that Odeh contacted the HLF Headquarters in Dallas five times during that week. (Ex. 1-60.) Another document shows an airline ticket purchased in 2000 in Odeh's name for travel from New Jersey to Dallas. (Ex. 1-98.) The New Jersey office received a contribution from a donor whose letter stated the money was for "relief supplies and weapons to crush the hated enemy." (Ex. 1-56.) Finally, Odeh was present at some of the IAP festivals during which donations for Hamas through the HLF were openly solicited and skits were presented praising Hamas, violent jihad, and the killing of Jews.

Viewing the evidence in light most favorable to the Government, the Court concludes that the Government's specific evidence concerning and involving Odeh coupled with the evidence about the histories of the Israeli-Palestinian conflict and the many organizations involved, HLF's connection to Hamas, and Odeh's connection with HLF is sufficient for a reasonable jury to conclude that Odeh was a knowing participant in a conspiracy to provide material support to Hamas (Count 1). Likewise, the Court concludes that the Government's evidence against Odeh was sufficient for a reasonable jury to conclude that Odeh was a knowing participant in a conspiracy to provide funds, goods or services to Hamas (Count 11). Likewise, the Court concludes that the evidence against Odeh was sufficient for a reasonable jury to conclude that Abdulqader was a knowing participant in a conspiracy to commit money laundering as alleged in the indictment (Count 22).[6]

---

[6] Prior to the second trial, the government dismissed counts 2-10, 12 -21, and 23-32 against Odeh.

Therefore, for the reasons stated herein, the Court hereby DENIES Abdulaqder's and Odeh's motions for judgment of acquittal.

It is SO ORDERED, this 26th day of March 2009.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE