IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | CRIM. NO. |
| § | 3:04-CR-0240-P |
| HOLY LAND FOUNDATION FOR § | |
| RELIEF AND DEVELOPMENT (1) § | |
| SHUKRI ABU BAKER (2) § | |
| MOHAMMAD EL-MEZAIN (3) § | |
| GHASSAN ELASHI (4) § | |
| MUFID ABDULQADAR (7) § | |
| ABDULRAHMAN ODEH (8) § | |

**MEMORANDUM OPINION ORDER**

Now before the Court are two motions from three organizations: the Council on American-Islamic Relations ("CAIR"), the Islamic Society of North America ("ISNA"), and the North American Islamic Trust ("NAIT") (collectively, "Petitioners"). CAIR filed its Motion for Leave to File a Brief *Amicus Curiae Instanter* ("Amicus Brief") on August 14, 2007. ISNA and NAIT filed their Motion for Equitable Relief from the Government's Public Naming of Them as Unindicted Co-Conspirators ("Motion") on June 18, 2008. In the Amicus Brief, CAIR seeks to have its name and the names of all other unindicted individuals and organizations stricken from the Government's List of Unindicted Co-conspirators ("the List"), that was filed with the Government's Trial Brief in the first trial of this case on May 29, 2007. In their Motion, ISNA and NAIT ask the Court to (1) declare the Government's public naming of them as unindicted co-conspirators a violation of their Fifth Amendment rights; (2) enter an order expunging their names from any public document filed or issued by the Government that identifies them as unindicted co-conspirators; (3) prohibit the

Government from identifying them as unindicted co-conspirators; and (4) order such relief as the Court deems equitable. After careful consideration of the briefing and the applicable law, the Court hereby GRANTS CAIR's motion to file its Amicus Brief and GRANTS in PART CAIR's, NAIT's and ISNA's requests for relief. [1]

## I.    BACKGROUND

This dispute is related to the criminal charges of conspiracy brought against the Holy Land Foundation for Relief and Development ("HLF") and seven other named defendants. (Tr. Br. at 31.) On May 29, 2007, the Government filed its Trial Brief outlining the scope of the alleged conspiracy and identifying the different types of evidence it would seek to admit at trial, as well as the evidentiary bases for the admission of that evidence. (Tr. Br. at 27-33.) In its attempt to illustrate the breadth of the conspiracy, the Government provided the List, which contains the names of 246 individuals and organizations that the Government identified as unindicted co-conspirators. (Tr. Br. at 31, Attachment A.) The Government listed CAIR, ISNA, and NAIT as entities who are or were members of the U.S. Muslim Brotherhood's Palestine Committee and/or its organizations. (Attachment A at 5; Mot. 6.)

The first trial of this case commenced on July 16, 2007. The Government called its first witness on July 25, 2007. The trial was still underway when CAIR filed its Amicus Brief on August 14, 2007. The first trial resulted in a hung jury and mistrial on October 22, 2007. On February 13, 2008, the Court scheduled this case for retrial. ISNA and NAIT filed their Motion on June 18, 2008.

---

[1] The Court urges CAIR and the Government to consult and comply with Local Criminal Rule 47.2(d), which requires that a brief in excess of ten (10) pages contain a table of contents with page references and a table of authority.

CAIR objects to the public release of the List because it violates the named individuals' and organizations' rights to due process under the Fifth Amendment and has a chilling effect on their First Amendment free speech and association rights. CAIR requests that the Court strike the names of the unindicted co-conspirators and seal the List and any other documents that name them as unindicted co-conspirators. (Amicus Br. at 55; Mot. 3.)

The Government argues that CAIR should not be permitted to submit its Amicus Brief because (1) CAIR's submissions are neither useful nor timely; (2) CAIR lacks standing; and (3) CAIR's claims are moot. The Government also argues that CAIR's name should not be stricken from the List because CAIR has not established that it is impermissible to disclose the identity of an unindicted co-conspirator when that unindicted co-conspirator is subsequently identified at trial as a member of an ongoing, unlawful conspiracy. (Resp. at 22.)

## II.  CAIR'S MOTION

### A. Leave to File Amicus Brief

The Government argues that CAIR's motion for leave should be denied because the Amicus Brief is used to promote CAIR's own interest instead of assisting the Court. (Resp. at 2.) The Government also argues that the motion is untimely. In response, CAIR acknowledges that this is not a typical amicus brief. It explains there is no procedural mechanism for the type of relief it seeks and the most sensible option is an amicus brief.

Generally, the function of an amicus brief is to aid the court with matters apparent on the record or matters of practice that may otherwise escape the Court's consideration. *See* 4 Am. Jur. 2d Amicus Curaie § 6 (2007). An amicus brief is proper when it assists the judge by presenting aspects

of ideas, arguments, theories, facts or data that are not in the parties' briefs. *See id.* § 3. Usually, an amicus may not file pleadings or motions in a case, may not raise issues that have not been presented by the parties, and may not seek relief beyond the scope of that sought by the parties. *See, e.g., Russell v. Bd. of Plumbing Examiners*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999); *State v. Alaska Civil Liberties Union*, 159 P.3d 513, 514 (Alaska 2006); *Nationwide Mutual Ins. Co. v. Chillura*, 952 So.2d 547, 553 n.7 (Fla. Dist. Ct. App. 2d Dist. 2007) (in the appellate context); Am. Jur. 2d Amicus Curaie §§ 6-7.

It is undisputed that CAIR's application for amicus status addresses an issue not raised by any of the Parties and seeks specific relief for CAIR and other non-parties to the case. It is also undisputed that there is no procedure available to CAIR for seeking and obtaining the relief it requests—it is not a party to the criminal case, and it cannot intervene in the criminal case as a non-party. *See In re Smith,* 656 F.2d 1101, 1104 n.8 (5th Cir. 1981) (the Federal Rules of Criminal Procedure "provide[ ] no procedure for intervention of a private party."); *see also United States v. Driscoll*, 445 F. Supp. 868, 868 (D.N.J. 1978).

In *In re Smith*, the district court allowed a non-party who was accused of taking a bribe to file a motion in the criminal action to have his name stricken from a factual resume. *See Smith,* 656 F.2d at 1104. On appeal, the Fifth Circuit noted that Rule 7(d) of the Federal Rules of Criminal Procedure allows the court to strike surplusage from an information upon a defendant's motion, and Rule 12(f) of the Federal Rules of Civil Procedure allows the court to strike immaterial, impertinent, or scandalous matter from the pleadings in civil cases—even if requested by a non-party. *See id.* The court stated that the non-party's "motion to strike and seal is an innovative hybrid of the two

procedures of which we approve." *Id.* The Court adopts the *Smith* court's practice under this set of circumstances and considers CAIR's amicus brief a "hybrid" motion to strike and seal pursuant to Federal Rule of Civil Procedure 12(f) and Rule 7(d) of the Federal Rules of Criminal Procedure.

The Government has not cited any authority establishing that CAIR's brief was untimely. CAIR, a non-party to this case, submitted its brief less than three months after the List containing 246 names was filed and before the trial concluded. The Court rejects the Government's untimeliness argument. The Court therefore GRANTS CAIR's Motion for Leave to file its Motion to Strike and Seal.

**B. Standing**

The Government argues that the Court may not consider CAIR's Motion because the Petitioners lack standing. To satisfy the federal standing requirement in this case, CAIR must show it suffered (1) injury-in-fact to its reputational interest; (2) a causal connection between the injury to its reputational interest and the Government's publication of its name as an unindicted co-conspirator; and (3) a likelihood the injury will be redressed by the Court striking its name from the list of unindicted co-conspirators. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

In *United States v. Briggs*, the Fifth Circuit held that named unindicted co-conspirators had standing to sue because they suffered "injury to their good names and reputations and impairment of their ability to obtain employment." 514 F.2d 794, 797 (5th Cir. 1975). The *Briggs* court did not rely on actual, concrete evidence of injury to establish standing, but instead found that standing exists where such "a characterization of an individual will expose him to public embarrassment and

ridicule" or where the labeling would interfere with a charitable organization's right to "carry on its work, free from defamatory statements." *Id.* at 797, 798.

There is no real dispute that CAIR suffered injury to its reputational interest by being listed as an unindicted co-conspirator in this terrorism case. Press accounts and blog entries have reported, based on this case, that CAIR is a criminal organization that supports terrorism. (Reply Attachments 1, 2; Mot. Appx. A, B.) Additionally, CAIR has been forced to defend itself against violent threats as a direct result of being named an unindicted co-conspirator. (*See id.*) Moreover, CAIR's designation by the Government impacts its credibility by impeding its stated missions that include fostering better relations for American Muslims, developing educational and social outreach programs, and enabling Muslim communities to pool their assets. The relief CAIR requests would redress the injury it continues to suffer.

### C. Mootness

The Government also argues that CAIR's claim is moot because CAIR's status as a co-conspirator was made a matter of public record at trial through evidence and testimony and thus, striking CAIR's name from the Trial Brief will not prevent its co-conspirator status from being publicly available and known. (Resp. at 11-15.) The Government identifies four portions of the record from the first trial that purportedly establish that CAIR was a "joint venturer and co-conspirator": (1) a Government exhibit showing the objective of the Palestine Committee is to support Hamas; (2) a Government exhibit showing that CAIR founder Omar Ahmad is part of the Palestine Committee and Mousa Abu Marzook is its head; (3) a Government exhibit listing CAIR as part of the Palestine Committee; and (4) the testimony of Special Agent Lara Burns and

accompanying exhibits placing the CAIR founder at the 1993 Philadelphia conference and describing the CAIR founder's mediation of a dispute between HLF and Ashqar over Hamas fundraising. (Resp. at 12-13.) The Government does not mention any occasion where it used the 801(d)(2)(E) hearsay exception to introduce a statement of CAIR. The four pieces of evidence the government relies on, as discussed below, do create at least a prima facie case as to CAIR's involvement in a conspiracy to support Hamas; however, even if the proverbial "cat was let out of the bag" at trial, there is an ongoing injury that will persist as long as the public has ready access to the Government's list of unindicted co-conspirators.

Additionally, as a practical matter the public has readier access to the Government's Trial Brief than it does to any trial exhibits or testimony. The Trial Brief is accessible through the internet to everyone, 24-hours a day, 7-days a week. Because of easy access to this information, any member of the public, including the press, sees CAIR's name associated with HLF, Hamas, and other known supporters of terrorist organizations. This injury will occur as long as the public has access to this information. Thus, the Court concludes that CAIR's claim is not moot, and it may consider its Motion to Seal and Strike.

### D. Asserting the Rights of Others

The Government argues that CAIR lacks prudential standing to seek relief on behalf of the other unindicted co-conspirators. (Resp. at 20-21.) As a general rule, a party may assert his own legal interests, not those of third parties. *See Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 629 (1991). An exception exists if the litigant can demonstrate that it has suffered a concrete, redressable

injury, that it has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his or her own interests. *See id.*

The Court held *supra* that CAIR has demonstrated that it suffered a concrete, redressable injury. Also, the Government publicly identified the names of 246 unindicted co-conspirators in the same document, during the same trial, and without any supporting documentation. However, as this case demonstrates, the other 246 individuals and entities have the same mechanism available to them as CAIR, NAIT, and ISNA to redress their injury. The others have chosen not to file motions in this Court. For these reasons, the Court concludes that CAIR does not have standing to seek relief on behalf of the other listed unindicted co-conspirators.

**E. Sealing the List**

CAIR argues that the Government's public identification of CAIR and others as unindicted co-conspirators violates the Department of Justice's ("DOJ") attorney guidelines. According to CAIR, United States Attorney's Manual 9-11.130 discourages prosecutors from identifying unindicted co-conspirators in indictments. (Br. at 11-12.) The Government argues, and the Court agrees, that the DOJ's attorney manual is used to provide internal guidance and does not create any enforceable rights by a party in a civil or criminal context. (Resp. at 23-25); *see, e.g., Nichols v. Reno*, 124 F.3d 1376 (10th Cir. 1997).

CAIR also argues that the Government's public disclosure of CAIR as an unindicted co-conspirator violates its Fifth Amendment right to due process. The seminal case on this issue is the Fifth Circuit case *United States v. Briggs,* in which the court held that the liberty and property concepts of the Fifth Amendment protect an individual from being publicly and officially accused

of having committed a serious crime, particularly where the accusations gain wide notoriety. 514 F.2d 794, 797-99 (5th Cir. 1975). The Fifth Circuit held that courts must weigh the harm suffered by the private individual against the legitimate governmental interest that is served by "stigmatizing private citizens as criminals while not naming them as defendants or affording [them] . . . access to any forum for vindication." *Id.* at 804. The *Briggs* court found that a federal grand jury violated the petitioner's right to due process by identifying him as an unindicted co-conspirator in the indictment.

In *In re Smith*, the Fifth Circuit extended the *Briggs* ruling to a factual resume read by the prosecutor during a plea hearing in open court. 656 F.2d 1101 (5th Cir. 1981). In *Smith*, the factual resume accused Mr. Smith of taking a bribe from the defendant. *Id*. at 1106. The court held that no legitimate governmental interest was served by an "official public smear of an individual when that individual has not been provided a forum in which to vindicate his rights." *Id*. Subsequent cases have held that the *Briggs* balancing test weighs in favor of protecting the individual's private interests when the unindicted co-conspirator's name appears in a bill of particulars, other pretrial filings, and sentencing documents. *See, e.g., United States v. Smith*, 776 F.2d 1104, 1105 (3d Cir. 1985) (bill of particulars); *U.S. v. Anderson*, 55 F. Supp. 2d 1163, 1168-69 (D. Kan. 1999) (pretrial motion filed by Government).

By contrast, courts do tend to allow the identification of unindicted co-conspirators through discovery and trial testimony. *See United States v. Ladd*, 218 F.3d 701 (7th Cir. 2000) (allowing identification of co-conspirators whose hearsay statements were admitted into evidence pursuant to Fed. R. E. 801(d)(2)(E)); *Anderson*, 55 F. Supp. 2d at 1169; *see also Briggs*, 514 F.2d at 805. Courts have held that there is an important distinction between being unqualifiedly identified in a pretrial

document as an unindicted co-conspirator and being identified as a co-conspirator at trial for purposes of Federal Rule of Evidence 801(d)(2)(E). Under Rule 801(d)(2)(E), the Government must demonstrate, by a preponderance of the evidence, that the individuals, although unindicted, were in fact members of a conspiracy. *See Ladd*, 218 F.3d at 705.

The Court sees no reason not to extend *Briggs* and its progeny to this case. The *Briggs* balancing test requires first that the Court identify the harm to the unindicted co-conspirators. The List communicates to the general public that the named organizations and individuals, in the opinion of the chief federal law enforcement official of the district, are guilty or may be guilty of engaging in terrorist support and/or activity. This information is unaccompanied by any facts providing a context for evaluating the basis for the United States Attorney's opinion. Neither CAIR nor the other unindicted co-conspirators have been charged with a crime and they have no judicial forum in which to defend against the accusation. *See Smith*, 776 F.2d at 1106-07, 1113-14. The evidence indicates that the release of the List subjected CAIR to annoyance, ridicule, scorn, and loss of reputation in the community. CAIR has been subjected to violent threats and has been made the subject of news stories and articles. It is reasonable to surmise that donations to CAIR have and will suffer as a result of this designation.

The Government has not argued or established any legitimate government interest that warrants publicly identifying CAIR and 245 other individuals and entities as unindicted co-conspirators. The only possible legitimate interest the Government could assert is the public's interest in having access to the trial to ensure the legitimacy of the proceedings. *See, e.g., Ladd*, 218 F.3d at 703-04 (recognizing the presumption that all trial proceedings should be subject to scrutiny

by the public). Yet the Court is unaware of any way that access to the List would assist the public in evaluating the legitimacy of the proceedings. It appears doubtful the Government intended to use the statements of all 246 individuals or entities under Fed. R. E. 801(d)(2)(E).

The Government had available less injurious means than those employed in this case—it could have anonymously designated the unindicted co-conspirators as "other persons," it could have asked the Court to file the document under seal, or it could have disclosed the information to Defendants pursuant to a protective order. *See, e.g, Smith*, 776 F.2d at 1105-06; *Briggs,* 514 F.2d at 805.  This invasion of privacy far outweighs the interest in publicly naming CAIR and others as coconspirators.  *Anderson*, 55 F. Supp. 2d at 1168.  Therefore, the Court grants CAIR's motion to seal the list.

### III.    ISNA AND NAIT'S MOTION

In their Motion, ISNA and NAIT argue: (1) that the Government violated their Fifth Amendment rights when it publicly named them as unindicted co-conspirators, (2) the Government has not asserted any interest that justifies its decision to publicly identify ISNA and NAIT, and (3) that this Court has the authority to remedy this controversy. (Mot. at 8-21.) In the Government's response, the Government claims that ISNA and NAIT lack standing to bring this claim, the claim is moot, and the claim is untimely. (Resp. at 8-18.)

#### A.  *Briggs* Analysis for Violation of Fifth Amendment Rights

ISNA and NAIT claim that the Government violated their Fifth Amendment rights by naming them as unindicted coconspirators. (Mot. at 8.)  The Court used the *Briggs* balancing test to evaluate CAIR's claim and will also use *Briggs* to assess ISNA and NAIT's claim.

3:04-CR-0240-P
Order
Page 11 of 20

First, the Court must determine the harm caused to ISNA and NAIT. Like CAIR, ISNA and NAIT have been indentified as co-conspirators without being charged with a crime or having available any forum in which to defend themselves. *See Smith*, 776 F.2d at 1106-07, 1113-14. Both ISNA and NAIT have been the subject of news reports, editorials and blog posts in which they are accused of, among other things, being "an integral part of the [Muslim] Brotherhood's effort to wage jihad against America," and "radical Muslim organizations." (Mot. App. A, Ex. B; Mot. App. B, Ex. A.) Again, it is reasonable to surmise that donations to ISNA and NAIT have or may decrease as a result of these characterizations. Additionally, the government agencies that have traditionally worked with ISNA to create a better understanding of Muslim culture have been pressured into cutting ties with ISNA as a result of its being named co-conspirator. (*See* Mot. App. A, Ex. B at 8-9.) In light of these facts, both ISNA and NAIT shown that being named unindicted co-conspirators has caused a real harm to them.

The Government has not cited any legitimate interest for publicly naming ISNA and NAIT as unindicted co-conspirators. The Government originally included them on the List in order to use their statements under Fed. R. E. 801(d)(2)(E). (Mot. at 6-7.) The Court finds that no legitimate interest existed to justify publicly naming ISNA and NAIT as unindicted co-conspirators.

Finally, as noted above, the Government had available less injurious means to accomplish its purpose. This invasion of privacy far outweighs the interest in publicly naming ISNA and NAIT as coconspirators." *Anderson*, 55 F. Supp. 2d at 1168.

### B. Standing

To have standing, ISNA and NAIT must show they suffered (1) factual injury to their reputational interests; (2) a causal connection between their injuries and the government's naming of them as unindicted co-conspirators; and (3) a likelihood the injury will be redressed by the Court, should it grant their motion. *See Lujan*, 504 U.S. at 560. In applying this test, the *Briggs* court found that standing exists where such "a characterization of an individual will expose him to public embarrassment and ridicule" or where the labeling would interfere with a charitable organization's right to "carry on its work, free from defamatory statements." *Briggs*, 514 F.2d at 797, 798.

As noted above, ISNA and NAIT have suffered a concrete and redressable injury in the damage to their reputational interests. This damage was a result of their being publicly named as unindicted co-conspirators, as shown by multiple examples of media reports characterizing them as sympathizers to Islamic terror organizations. (*See e.g.,* Mot. App. A, Ex. B; App. B, Ex. A.) Also, sealing the record of the List would redress the injury NAIT and ISNA suffer. Thus, the Court concludes that ISNA and NAIT have standing to bring the Motion.

### C. Mootness

The Government also attacks ISNA and NAIT's claim as moot. (Resp. at 10-16.) ISNA and NAIT respond by arguing that as long as their names are on the publicly available List, there exists an ongoing controversy. (Reply at 8-9.) As the Court already determined with CAIR, the injury to ISNA and NAIT will continue as long as their names are available to the public as unindicted co-conspirators. Also, because Trial Brief is available to any member of the public at any time and is more accessible than the exhibits presented at trial, sealing these records would constitute

meaningful relief.² *See Smith*, 656 F.2d at 1106. Therefore, the Court finds that ISNA and NAIT claims are not moot.

   **D. Timeliness**

The Government contends that ISNA and NAIT's Motion is time barred because they did not file the Motion until June 18, 2008, whereas the Government filed its Trial Brief naming them as unindicted co-conspirators on May 29, 2007. Although the time between these two dates is more than a year, ISNA and NAIT believed that the Government intended to remove their names from the List, as evidenced by communications regarding the removal of their names continuing through August 2007 and ending April 2008. (Reply at 10-11; Mot. App. C, Ex. A, B.) Additionally, other courts have granted parties relief when their reputation still suffered for periods after the trial in which they were named co-conspirators. *See, e.g., Anderson*, 55 F. Supp. 2d at 1168; *Delpit v. Beckner*, 481 F. Supp. 42, 46 (M.D. La. 1979) (granting relief from being named an unindicted co-conspirator, despite no explanation for a delay of greater than one year). Because ISNA's and NAIT's injuries are "real, direct and continuous," relief may be granted. *See Briggs*, 514 F.2d at 800. Thus, the Court finds that the ISNA and NAIT Motion is timely.

**IV.   CAIR, ISNA and NAIT's Motions to Strike**

Finally, CAIR, NAIT and ISNA ask the Court to strike their names from any public document filed or issued by the government. (Mot. at 6.) While it is clear from the *Briggs* line of cases that the Government should have originally filed the unindicted co-conspirators' names under seal, the Court declines to strike CAIR, ISNA and NAIT's names from those documents. The

---

² The overwhelming majority of media reports provided by ISNA and NAIT link them to terrorist organizations based on the unindicted co-conspirators list, rather than evidence presented at trial. (*See generally* Mot. at App. A, B.)

Government has produced ample evidence to establish the associations of CAIR, ISNA and NAIT with HLF, the Islamic Association for Palestine ("IAP"), and with Hamas. While the Court recognizes that the evidence produced by the Government largely predates the HLF designation date, the evidence is nonetheless sufficient to show the association of these entities with HLF, IAP, and Hamas. *See U.S. v. Ladd*, 218 F.3d at 704-05 ("the Government must prove by a preponderance of the evidence that a conspiracy existed"). Thus, maintaining the names of the entities on the List is appropriate in light of the evidence proffered by the Government.

Government Exhibit 3-85 is titled "An Explanatory Memorandum on the General Strategic Goal for the Group in North America," authored by Mohamed Akram of the Shura Council of the Muslim Brotherhood and dated May 22, 1991. (Gov't Ex. 3-85 (Elbarasse 3) at 21.) The "Explanatory Memorandum" includes a section titled "Understanding the role of the Muslim Brother in North America," which states that the work of the Ikhwan in the United States is "a kind of grand Jihad in eliminating and destroying the Western civilization from within and sabotaging its miserable house by their hands and the hands of the believers so that it is eliminated and God's religion is made victorious over all other religions." (*Id.*) Also contained in that document is a list of the Muslim Brotherhood's "organizations and the organizations of our friends," which includes ISNA, NAIT, the Occupied Land Fund ("OLF") (HLF's former name), and the United Association for Studies and Research ("UASR"). (*Id.* at 32.) Government Exhibit 3-64, titled "Preliminary vision for preparing future leadership" and dated December 18, 1988, further ties ISNA to the Muslim Brotherhood by listing it as an "apparatus" of the Brotherhood. (Gov't Ex. 3-64 (Elbarasse 4) at 5.)

During the early years of OLF/HLF's operation, OLF raised money and supported Hamas through a bank account that it held with ISNA and NAIT. (Gov't. Exhs. 5-1 through 5-14, 5-23 through 5-26, 5-42 (NAIT).) Indeed, OLF operated from within ISNA, in Plainfield, Indiana, where Defendant Baker was employed. (Gov't. Exh. 5-6 (NAIT) at 3; 1-16 (HLF Search 14) at 20.) ISNA checks deposited into the ISNA/NAIT account for OLF were often made payable to "the Palestinian Mujahadeen," the original name for the Hamas military wing. (Gov't. Exh. 5-23 through 5-25 (NAIT); 1-174 (HLF Search 109).) From that ISNA/NAIT account, OLF sent hundreds of thousands of dollars to Hamas leader Mousa Abu Marzook, Nadia Elashi (Defendant Elashi's cousin and Marzook's wife), Sheikh Ahmed Yassin's Islamic Center of Gaza, the Islamic University, and a number of other individuals associated with Hamas. (Gov't. Exh. 20-55, 20-56 (OLF 1988-89 Disbursements).)

The Muslim Brotherhood supervised the creation of the "Palestine Committee," which was put in charge of other organizations, such as HLF, IAP, UASR, and ISNA. (*See* Gov't Ex. 3-15 (Elbarasse Search 5) at 14). The July 30, 1994 "Meeting Agenda for the Palestine Committee" lists IAP, HLF, UASR and CAIR as working organizations for the Palestine Committee. (Gov't Ex. 3-78 (Elbarasse 19) at 6.) Government Exhibit 3-15, titled "Islamic Action for Palestine - An internal memo - October - 1992," contains a section titled "Islamic Action for the Palestinian Cause in North America." (*Id*.) That section states that

> [w]hen . . . the Intifada started and the Islamic Resistance Movement (Hamas) was formed and the general apparatus for Palestine developed . . . a 'Palestine Committee' was formed under the supervision of the executive office [of the Muslim Brotherhood]. The Committee was then tasked with supervising all the organizations which serve the plan of the Movement domestically and internationally in addition to the Palestinian cause. Among these organizations were the 'Islamic Association' [the IAP], the 'Occupied Land Fund,' and the

'United Association' [the UASR]. Like other directors of the Movement's committees and sections, the director of Palestine Committee is to submit periodical reports and adheres to the directions and the guidance of the leadership of the Group.

The Palestine Committee was also known as the "Central Committee," or the Central Committee for Palestinian Activism in America. (*See* Gov't Ex. 3-5 (Elbarasse Search 13) at 7.) Government Exhibit 3-17 is a document titled "Re: A suggestion to amend the bylaws of the Central Committee," dated April 2, 1991. Articles 1 and 2 of the document state that the Palestine Committee will be called the Central Committee and it "originates from the Palestine Body formed by the Executive Office of the Muslim Brotherhood." (Gov't Ex. 3-17 (Elbarasse Search 7) at 8-9.) Article 4 states that the Central Committee is considered "the highest Shura and Executive authority in regards to work for the Palestinian cause on the American front . . ." (*Id*.) Article 4 goes on to state that the Committee is "focused on supervision and follow-up of all work and issues relating to the following fields: 1-Issues relating to the Islamic Association of Palestine . . . 2- Issues relating to the Occupied Land Fund . . . 3- Issues relating to the United Association for Studies & Research . . ." (*Id*.) In a later section, the International Shura Council and the Office of Guidance instruct to "collect[ ] donations for the Islamic Resistance Movement from the Ikhwan and others." (*Id*. at 12.) Additionally, in Government Exhibit 3-1, an organizational chart titled "Central Committee Org. Chart for the Year 1991" lists OLF and UASR under the Central Committee. (Gov't Ex. 3-1 (Elbarasse Search 10) at 1.)

Government Exhibit 3-5 is titled "Annual Report for the year 89-1990 Presented to the Organizational Conference." (Gov't Ex. 3-5 (Elbarasse Search 13) at 5.) It states that the Central Committee "is in charge of planning, directing and following up on all work related to and connected

to the Group." (*Id*. at 7.) The Central Committee "includes several committees and organizations, some of which are: The Islamic Association for Palestine, The Occupied Land Fund, The United Association for Studies & Research . . ." (*Id*.) The "Achievements" listed by the Palestine Committee include:

> Twenty-three Intifada festivals have been held this year . . . Al Sakhra band participated in over 25 festivals during activities of the Association and the Fund [HLF] . . . The sum of $728,059.04 has been raised through the Occupied Land Fund to support the steadfastness of the people in the Inside. Most of the money has been transferred . . . Five books have been issued by the United Association for Studies & Research. They are currently being marketed to benefit the Intifada . . . The Studies office [UASR] has published 5 issues of Al Aqsa bulletins and 6 issues of the Striking Arms leaflets.

In Government Exhibit 3-1, a chart titled "Chart Outline for Palestinian Action Aspects" lists Ahmad (founder of CAIR) under the UASR, and indicates that he is in charge of the Studies & Research Office. (Gov't Ex. 3-1 (Elbarasse 10) at 4-5.) The same "Chart Outline" also lists the IAP and the OLF, in addition to UASR. (*Id*. at 5.) Defendants Elmezain and Baker are listed in conjunction with HLF. (*Id*.)

Omar Ahmad also attended the 1993 Philadelphia conference, where leaders of the organizations under the Muslim Brotherhood umbrella met to discuss the future of the Brotherhood in the United States. The Philadelphia conference was attended by several members of the Palestine Committee, which supported and collected money for Hamas. At the conference, attendees discussed how to proceed in light of the recently negotiated Oslo Accords between Israel and Palestinians. Hamas opposed the Accords because it called for the recognition of the state of Israel. The attendees also discussed how they would have to be careful in their opposition to the Oslo Accords because they did not want to be viewed as being against the peace process or as aligned with terrorist groups.

The attendees agreed not to mention the word Hamas but to refer to Hamas as "Samah" which is Hamas spelled backwards. The Philadephia conference essentially laid out the path that the Palestine Committee would take to accomplish its goal of supporting Hamas in the future. Wiretaps from the Philadelphia conference reflect that Ahmad participated, together with Defendants Baker and Elashi, in a number of meetings related to the goals, strategies, and American perception of the Muslim Brotherhood. (*See* Gov't Exs. 16-69 (Philly Meeting 7) at 4-5; 16-77 (Philly Meeting 2) at 6;16-67 (Philly Meeting 5) at 5.) Topics discussed included redefining the perception of the sub-organizations due to their work for the Palestinian cause, and the legal hurdles the Brotherhood faced when raising funds for Hamas and other Palestinian causes or when taking orders from overseas leaders. (Gov't Exs. 16-77 (Philly Meeting 2) at 6;16-69 (Philly Meeting 7) at 4.)

Finally, ISNA was also discussed during the Philadelphia conference. During the conference, Palestine Committee members discussed using ISNA as official cover for their activities. (Gov't. Exhs. 16-59 (Philly Meeting13) at 10; 16-47 (Philly Meeting 1) at 10-11.)

Evidence presented in a public trial is inherently different from the Government publishing a list of persons alleged to be co-conspirators. The public may make its own judgment from evidence presented at trial. The evidence may be examined and conclusions can be drawn as to whether the evidence establishes what the government claims it does. But a published list from the Government naming individuals or entities as co-conspirators without any supporting evidence is not subject to such scrutiny. Therefore, the Court finds it appropriate to seal the entire list of unindicted co-conspirators but stops short of ordering CAIR, ISNA and NAIT's names expunged from any documents filed or produced by the government.

## IV.     CONCLUSION

It is therefore ordered that the District Clerk for the Northern District of Texas shall file and seal the Amicus Curaie Brief of the Council on American-Islamic Relations in Support of the Unindicted Co-Conspirators' First and Fifth Amendment Rights, which has been decided herein. The Clerk shall also seal Attachment A to the Government's Trial Brief, filed May 29, 2007 [Docket No. 656]. It is also ordered that all pleadings, records, documents, orders and other papers concerning (1) CAIR's Amicus Brief, (2) CAIR's Motion for Leave to file Amicus Brief, and (3) ISNA's and NAIT's Motion [Docket Nos. 777, 778, 797, 799, 850, 851] including this Order be sealed. All these documents shall be kept sealed until further order of this Court.

It is so **ORDERED**, this 1st day of July 2009.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE